**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                                                                   No. CR 21-0660 JB

CARMICHAEL LEWIS,

     Defendant.

**<u>MEMORANDUM OPINION AND ORDER</u>[1]**

     **THIS MATTER** comes before the Court on the Defendant's Sealed Motion to Determine

Competence to Stand Trial, filed August 13, 2021 (Doc. 24)("Motion").   The Court held a

Competency Hearing on October 28, 2021.   <u>See</u> Clerk's Minutes, filed October 28, 2021

(Doc. 34)(Sealed); Transcript of Hearing, taken October 28, 2021 ("Tr.")(Sealed).[2]   The primary

issue is whether Defendant Carmichael Lewis ("C. Lewis") is mentally competent to stand trial.

The Court finds that C. Lewis has not established, by a preponderance of the evidence, that he is

presently suffering from a mental disease or defect rendering him mentally incompetent to the

extent that he is unable to understand the nature and consequences of the proceedings or to assist

---

[1]In its Sealed Memorandum Opinion and Order, filed November 23, 2021 (Doc. 38)("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MOO before the Court publishes a public version.  <u>See</u> Sealed MOO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions.  <u>See</u> Sealed MOO at 1 n.1.  The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MOO in an unsealed form.

[2]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final versions may have slightly different page and/or line numbers.

in his defense.  Because C. Lewis has not met his burden of establishing, by a preponderance of the evidence, that he is mentally incompetent to stand trial, the Court denies C. Lewis' Motion.

## <u>FINDINGS OF FACT</u>

The Federal Rules of Criminal Procedure require the Court to state "its essential findings on the record" when "factual issues are involved in deciding a motion." Fed. R. Crim. P. 12(d). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes.  The Court makes the following findings of fact, based upon the Psychological Evaluation Report by Clinical and Forensic Psychologist, Dr. Susan Cave, <u>see</u> Psychological Evaluation Report, filed August 13, 2021 (Doc. 24-1)("Cave Report"); the Pretrial Services Report, <u>see</u> Pretrial Services Report, filed April 23, 2021 (Doc. 10)("Bail Report"); and the testimony of Lewis' sister, Shanna Lewis ("S. Lewis"), Dr. Susan Cave, Ms. Rivas -- C. Lewis' counsel -- and Drug Enforcement Administration Special Agent Jarrell Perry, at the Competency Hearing on October 28, 2021.  The Court recognizes that the factual background is largely the United States' version of events and that C. Lewis is presumed innocent.

The Court finds as follows:

1.     **<u>C. Lewis' Background and Clinical Assessments</u>**.

1.     C. Lewis was born in Chicago, Illinois, in 1994.  <u>See</u> Bail Report at 2.

2.     C. Lewis' parents are deceased, but he has "9-10 siblings."  Cave Report at 2.

3.     C. Lewis is in contact with three of his siblings: Shanna ("S. Lewis"), Cashinae, and Zachary.  <u>See</u> Bail Report at 1-2.

4.      When C. Lewis was four years old, he picked up a gun, and it discharged accidentally: "a bullet passed through the frontal lobes of his brain, entering on the left and passing through the right side of his skull."  Cave Report at 2.

5.      C. Lewis' mental abilities changed after the accident.  See Tr. at 11:3-14 (S. Lewis, Rivas).

6.      C. Lewis injured his head again in third grade, on the right side of his skull near his temple.  See Cave Report at 2.

7.      C. Lewis suffers from chronic headaches.  See Cave Report at 2.

8.      C. Lewis was enrolled in special education programs while in school.  See Cave Report at 2.

9.      C. Lewis does not have a high school diploma or general educational development ("GED").  See Bail Report at 2.

10.      C. Lewis had trouble reading while in school.  See Tr. at 12:10-12 (Rivas, S. Lewis).

11.      In July, 2011, Peter Nichols, M.D., of Streamwood Behavioral Health, Streamwood, Illinois, found that C. Lewis suffered from "Adjustment Disorder, Oppositional Defiant Disorder, Intermittent Explosive Disorder, Disruptive Behavior Disorder NOS, Provisional Attention Deficit/Hyperactivity Disorder, Mood Disorder NOS, Mild Mental Retardation[3] with a Full-Scale IQ between 54 and 63, History of Traumatic Brain Injury, Fracture to his Phalanx, and Fetal Exposure to Substances."  Cave Report at 3.

12.      Dr. Nichols did not prescribe C. Lewis any medication.  See Cave Report at 3.

---

[3]See n.10, infra, on the substitution of the term "intellectual disability" for "mental retardation."

13.     Licensed psychologist Paul Linden assessed C. Lewis at age eighteen as having an IQ of 61.  See Cave Report at 3.

14.     C. Lewis has never been employed, and the Social Security Administration ("SSA") has found Lewis "unemployable."  Cave Report at 2-3.

15.     The SSA has found Lewis to be "100%" disabled.  Tr. at 12: 9 (S. Lewis).  See id. at 12:6-8 (Rivas, S. Lewis).

16.     S. Lewis is the payee for Lewis' Supplemental Security Income ("SSI") payments. See Cave Report at 3.

17.     C. Lewis has received SSI since the accident, which occurred when he was four years old.  See Tr. at 12:1-7 (Rivas, S. Lewis).

18.     Since January 1, 2019, C. Lewis has lived with S. Lewis, a brother, and several nieces and nephews.  See Bail Report at 2.

19.     C. Lewis has two children: J.L., age eleven, and N.L., age one.  See Bail Report at 2.

20.     J. L. lives with his mother, Janice Mitchell, in Danville, Illinois, and N. L. lives with his mother, Akilah Lee, in Lafayette, Indiana.  See Bail Report at 2.

21.     C. Lewis has problems remembering things that have been said to him an hour and a half later, see Tr. at 11:19-22 (Rivas, S. Lewis), but does not have trouble "recalling his actual experience," Tr. at 46:5-6 (Cave).

22.     C. Lewis often "ask[s] the same thing over and over like he don't understand."  Tr. at 11:17-18 (S. Lewis).

23.     C. Lewis scored eight out of fifteen on the Rey 15 Item Test with Recognition Phase, which tests for memory and malingering.[4] See Cave Report at 4-5 ("Persons with average memory function should be able to remember 9 of the 15.").

24.     C. Lewis scored at "less than the 25th percentile" in the Rey-Osterrieth Complex Figure test,[5] which "examines the client's ability to recall information (memory) and copy it freehand (cognition)." Cave Report at 5.

25.     C. Lewis "has moderate to severe cognitive dysfunction, which is . . . related to the brain trauma self-inflicted accident[al]ly at age 4." Cave Report at 5.

26.     C. Lewis has an IQ below 70, which falls within the range for intellectual disability. See Tr. at 32:19-33:16 (Rivas, Cave); Cave Report at 7.

---

[4]The "Rey 15 Item Test . . . is used to assess symptom validity or feigned memory impairment." Kenneth Podell, Rey 15 Item Test in Encyclopedia of Clinical Neuropsychology (Jeffrey S. Kreutzer, John DeLuca, Bruce Caplan, eds., 2011), available at https://link.springer.com/referenceworkentry/10.1007%2F978-0-387-79948-3_211 (last visited November 17, 2021). Dr. Cave describes the Rey 15 Item Test with Recognition Phase as

> a very simple task that invites a person who would want to exaggerate memory problems to do so. It consists of 5 rows of 3 items each, each of which is systematically related to each other in a row, such as '1 . . . 2 . . . 3, A . . . B . . . C,' etc. Persons with average memory function should be able to remember 9 of the 15.

Cave Report at 5.

[5]The Rey-Osterrieth Complex Figure test is "a neuropsychiatric test for gauging memory, decision-making, organization, planning, and visual/spatial processing in people suspected of having brain damage or learning disabilities." Rey-Osterrieth complex figure test, in Medical Dictionary (2009), available at: https://medical-dictionary.thefreedictionary.com/Rey-Osterrieth+complex+figure+test (last visited November 18, 2021).

27.     C. Lewis' Peabody Picture Vocabulary Test4[6] -- "a wide-range instrument used for measuring the receptive (auditory) vocabulary" -- reveals that he has a cognitive age of five years, six months.  See Cave Report at 5-6.

28.     Dr. Cave administered the Competency Assessment for Standing Trial for Defendants with Mental Retardation ("CAST-MR") test,[7] and C. Lewis scored fifty-six percent for his understanding of basic legal concepts, forty-six percent for "skills to assist defense," one hundred percent for understanding "case events," and had an overall score of sixty-two percent, which is below the passing score of sixty-five percent.  Cave Report at 6.  See Tr. at 36:3-37:4 (Cave).

29.     C. Lewis knows that:

        a.      he is charged with "possession," Cave Report at 6;

---

[6]"The Peabody Picture Vocabulary Test - 4th Edition (PPVT-4) is designed to measure the receptive (hearing) vocabulary of English-speaking adults and children. While no specific content areas are described in the manual, the authors declare that the test is designed to cover a broad range of English-language content."  Community-University Partnership for the Study of Children, Youth, and Families, Early Childhood Measurement and Evaluation Tool Review: Peabody Picture Vocabulary Test, Fourth Edition (PPVT-4) 1, available at https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&cad=rja&uact=8&ved =2ahUKEwjV7uHB95_0AhVOpnIEHV0XBPQQFnoECAQQAQ&url=https%3A%2F%2Fwww .ualberta.ca%2Fcommunity-university-partnership%2Fmedia-library%2Fcommunity-university-partnership%2Fresources%2Ftools---assessment%2Fppvt-4may-2012.pdf&usg=AOvVaw1JvmR5KiMur7rTTe3syUYP  (last visited, November 18, 2021).

[7]The Competence Assessment for Standing Trial for Defendants With Mental Retardation "consists of 50 questions and was designed to assess defendants' understanding of basic legal concepts, ability to assist their attorneys, and ability to relate important information regarding their own legal circumstances.  Its purpose is to assist forensic evaluators in determining competency in defendants with mental retardation." iresearch.net, Competence Assessment for Standing Trial for defendants with Mental Retardation, available at http://criminal-justice.iresearchnet.com/forensic-psychology/competence-assessment-for-standing-trial-for-defendants-with-mental-retardation-castmr/ (last visited Nov. 18, 2021).  See also n.10, infra.

b.      he is charged with a "felony," Cave Report at 6;

c.      he is facing a sentence with "lotta time," Cave Report at 6;

d.      probation means that he has to "call somebody," Cave Report at 6;

e.      a condition of probation includes "drug classes," Cave Report at 6;

f.      not guilty means "I didn't do the charge," Cave Report at 6;

g.      guilty means "you did it," Cave Report at 6;

h.      the defense attorney is there as "somebody runs with you -- hears your side of the story," Cave Report at 6;

i.      the United States' attorney is "with the judge," Cave Report at 6;

j.      the judge is there to "give you time," Cave Report at 6;

k.      the jury's function is to "I don't know -- work with you," Cave Report at 7;

l.      his role as a defendant is "not talking," Cave Report at 7;

m.      the witnesses are "somebody told on you," Cave Report at 7;

n.      the prosecutor is someone trying to "take you away," Cave Report at 7;

o.      evidence is "they got something on you," Cave Report at 7;

p.      he wants his case's outcome to be that he "go home," Cave Report at 7;

q.      his defense attorney is "somebody in your corner," Cave Report at 7; and

r.      in court he is supposed to be "quiet," but knows that he can speak "if judge asks you."  Cave Report at 7.

30.    C. Lewis knows "what a plea bargain was, what plea he would have to make to get a plea bargain, as well as what rights he would give up to get a plea bargain."  Cave Report at 7.

31.    Ms. Rivas testified that:

Every single day, every single day[,] Mr. Lewis calls me and asks me the same question. . . .  Sometimes . . . twice a day and . . . it's still the same conversation.  I met with Mr. Lewis many times over the phone, by video, and in person, and we cannot, we cannot get any resolution as to just for him to understand what the United States sentencing guidelines are.

Tr. at 96:21-97:6 (Rivas).

32.    Ms. Rivas testified that "[H]e really only understands that he's looking at a lot of time. . . . He doesn't understand really what that time really is."  Tr. at 97:11-14 (Rivas).

33.    When Ms. Rivas entered a break out room to talk with C. Lewis during the hearing, "I couldn't get him focused on the questions."  Tr. at 97:20-23 (Rivas).

2.    **Events Leading to C. Lewis' Arrest.**

34.    C. Lewis was traveling by Greyhound bus from Arizona to Chicago, Illinois, through Albuquerque, New Mexico, on April 19, 2021.  See Response at 2-3; Cave Report at 2.

35.    Drug Enforcement Administration Special Agent Jarrell Perry encountered C. Lewis on the Greyhound bus and requested that C. Lewis consent to a search of C. Lewis' backpack.  See Response at 3.

36.    During the Competency Hearing, C. Lewis interrupted Perry to contradict Perry's testimony that he was wearing shorts and a t-shirt during the encounter, see Tr. at 73:16-18 (Perry, Lewis), and to say, "Did you tell him about the bathroom too before I got on . . . the bus[?]," Tr. at 74:6-7 (Lewis).

37.    C. Lewis also interrupted Perry to say that Perry was lying:

Q.      [W]hen you were talking to him and you asked him about his shaky hands, he explained that his hands weren't shaking?

A.      That was later on I observed him shaking[,] when he handed me his ticket; that was the second time.

Q.      But he said they're not shaking?

THE DEFENDANT:  He's lying.

Tr. at 89:14-21 (Rivas, Perry, C. Lewis).

38.     Perry testified:

I asked [C. Lewis] . . . if a backpack that he had on his back was his[;] he stated it was.  I asked him if he'd give me consent to search it and he said ["]No.["]  I asked him if he would open it up and show me.  He said it just had clothing in there[;] I asked if he would open it up . . . and show me the . . . contents inside . . . the clothing[;] he said yes he did that[;] he opened it up just a small portion where you could barely see anything that was inside of the backpack and in my opinion in a nervous manner and not to reveal the content of his backpack.

Tr. at 78:5-79:4 (Spiers, Perry).

39.     Perry approached C. Lewis a second time, and "asked him about [allowing a] narcotics [canine] to sniff his bag for the odor of illegal narcotics . . . ."  Tr. at 80:18-19 (Perry).

40.     Perry could not remember C. Lewis' exact response, but "he . . . probably[,] I think[,] asked me a question about was the dog there and I told him no but I was going to call one."  Tr. at 80:20-22 (Perry).

41.     Perry testified that he listened to C. Lewis' conversation with his sister: "He was telling her that I was trying to[,] wanting to[,] search his bag and the police were there, and that they were trying to take his bag I believe was his comment."  Tr. at 81:10-13 (Perry).

42.     Perry then

asked [C. Lewis] about his ID[;] [he] said he didn't have one[;] asked him his name
and then . . . about an address in case . . . [Perry told C. Lewis that, if] the dog didn't
alert . . . and we didn't get a search warrant we could ship the backpack[.]  [H]e
provided an address in Chicago with a zip code to me and I wrote it down on a card.

Tr. at 81:18-25 (Perry).   Perry testified that "I asked him for his name and date of birth[;] he

provided that to me . . . ."  Tr. at 82:3-4 (Perry).

43.    C. Lewis relayed S. Lewis' address to Perry as S. Lewis was telling it to him over

the telephone.  See Tr. at 16:13-24 (Spiers, S. Lewis).

44.    C. Lewis then consented to allow a narcotics canine sniff his backpack.  See

Response at 3.

45.    C. Lewis gave Perry an address in Chicago where to send the backpack, should the

canine not alert to narcotics, and C. Lewis then boarded the bus without his backpack.  See

Response at 3.

46.    C. Lewis was able to repeat her address to Perry immediately after hearing it from

S. Lewis over the telephone.  See Tr. at 15:21-16:24 (S. Lewis, Spiers).

47.     C. Lewis' prior criminal history includes "guilty pleas to at least two felony

conviction[s] and at least four misdemeanor convictions."  Sealed Response by the United States

to the Defendant's Motion to Determine the Defendant's Competence to Stand Trial at 4, filed

August 25, 2021 (Doc. 25)("Response")(citing Bail Report at 5-10).

## PROCEDURAL BACKGROUND

A federal Grand Jury indicted C. Lewis on May 12, 2021, with "Possession with Intent to

Distribute 500 Grams and More of a Mixture and Substance Containing Methamphetamine" in

violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and "Possession with Intent to Distribute 400

Grams and More of Fentanyl . . ." in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  Indictment at 1, filed May 12, 2021 (Doc. 16).  See Motion at 1.  The Honorable Kirtan Khalsa, United States Magistrate Judge for the United States District Court for the District of New Mexico, ordered C. Lewis to be detained pending trial.  See Order of Detention Pending Trial at 2, filed April 23, 2021 (Doc. 14).

> 1.    **C. Lewis' Motion to Determine Competence.**

C. Lewis filed a motion to determine his competence to stand trial on August 13, 2021. See Motion at 1.  C. Lewis argues that he is not competent to stand trial and attaches the Cave Report in support of his Motion.  See Motion at 2; Cave Report at 1.  Based on the Cave Report's findings, C. Lewis argues that his IQ of 61, combined with the physical damage to his frontal lobe from a gunshot wound when he was four years old, make him incompetent to stand trial.  See Motion at 2.  C. Lewis argues that "Dr. Cave's report confirms that Mr. Lewis' incompetency stems from a traumatic brain injury, which cannot be corrected with medication."  Motion at 2 (citing Cave Report at 3-4).  C. Lewis argues that he is unable to understand what is happening in his case.  See Motion at 2.  The Cave Report states as the test of competency that:

> Competency examination under Title 18 U.S.C. section 4241 specifies that the examination is necessary to determine whether or not the defendant "may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly assist in his own defense . . ."  The test of understanding and ability for [the] defendant to assist in his or her defense is whether the defendant has "sufficient present ability to consult with counsel with a reasonable degree of rational understanding and whether he has a rational as well as functional understanding of the proceedings against him."

Cave Report at 2 (quoting 18 U.S.C. § 4244 (1952), a previous version of 18 U.S.C. § 4241; no citation for second quotation).[8]

### 2.    **The United States' Response.**

The United States responds, asserting the Cave Report incorrectly states the relevant legal standard: "This competency evaluation report . . . indicates that the construct of its competency examination confused the competency evaluation statute -- 18 U.S.C. § 4241 -- with the language of the determination of the existence of insanity at the time of the offense statute -- 18 U.S.C. § 4242."   Sealed Response by the United States to the Defendant's Motion to Determine the Defendant's Competence to Stand Trial at 1, filed August 25, 2021 (Doc. 25)("Response")(citing Cave Report at 2).   The United States further argues that the Cave Report is compromised by an "evident advocacy component," Response at 1, and criticizes the Cave Report's "use of unhelpful, gratuitous asides about past evaluators such as ' . . . diagnoses seem somewhat ridiculous . . .' and '. . . seems like a dereliction of his duty for patient care,'"  Response at 5 (quoting Cave Report at 3-4).   The United States also argues that "implicit" in the Cave Report "is a conclusion that the Defendant may in fact be competent to stand trial."   Response at 1.   The United States argues that the Cave Report "plainly describes how [C. Lewis] had a functioning grasp of assisting in his defense in the context of possible punishment."   Response at 5 (citing Cave Report at 6-8).

The United States urges the Court to request a second psychiatric or psychological examination of Lewis pursuant to 18 U.S.C. §§ 4241(b) and 4247(b) and (c) at a Federal Medical Facility.   <u>See</u> Response at 2.   The United States argues that C. Lewis' prior criminal history -- in

---

[8]The Cave Report improperly includes wording the test for insanity at the time of the offense in the test for competency to stand trial.

which Lewis pled guilty to felony and misdemeanor convictions -- "presumes representation by counsel properly assisted by the Defendant," and does not show that C. Lewis had "competency issues," or was unable to "understand the proceedings against him" or "properly assist his counsel in his defense."  Response at 4.  The United States argues that C. Lewis interacted competently and rationally with Perry, as well as with the pretrial services officer.  See Response at 3-4.

C. Lewis then filed a motion to amend the Cave Report to correct the legal standard described in the Cave Report.  See Defendant's Sealed Motion to Amend Exhibit to Motion to Determine Competence to Stand Trial at 1, filed October 27, 2021 (Doc. 33)("Motion to Amend").  The Amended Cave Report states the "Definition of Competence to Stand Trial in Feder[a]l Court" as:

> "[T]he test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."

Psychological Evaluation Report at 2, filed October 27, 2021 (Doc. 33-1)("Amended Cave Report")(quoting Dusky v. United States, 362 U.S. 402, 402 (1960)).  The Amended Cave Report also omits paragraphs on pages 3 and 4 about Peter Nichols' 2011 diagnoses of C. Lewis.  Both the Cave Report and the Amended Cave Report were admitted into evidence at the Competency Hearing.  See Tr. at 66:14-67:11 (Court, Rivas, Spiers).

**3.    The Competency Hearing.**

The Court held a hearing on C. Lewis' competency on October 28, 2021.  See Clerk's Minutes at 1.  C. Lewis first called C. Lewis' sister, S. Lewis, to testify.  See Tr. at 10:1-4 (Rivas); id. at 10:7-8 (Court).  S. Lewis described how her brother's mental abilities changed after the accident, see Tr. at 11:3-14 (S. Lewis, Rivas), and how he has problems with remembering things

for more than an hour and a half, see Tr. at 11:15-22 (S. Lewis, Rivas).  On cross-examination, S. Lewis described how C. Lewis was able to repeat her address to Perry immediately after hearing it from her over the telephone.  See Tr. at 15:21-16:24 (S. Lewis, Spiers).

Next, C. Lewis called Dr. Cave to testify about her examination of C. Lewis and her report. See Tr. at 19:12-14 (Rivas).  Dr. Cave described her education, training, and background in psychology.  See Tr. at 20:16-21:11 (Rivas, Cave).  Dr. Cave stated that she has been a psychologist for forty years and has testified on competency during that whole time.  See Tr. at 21:25-22:4 (Rivas, Cave).  Dr. Cave testified that she has testified in federal court a couple of hundred times and the Court has appointed her to do some competency evaluations.  See Tr. at 22:15-23:1 (Rivas, Cave).  C. Lewis moved to admit Dr. Cave as a competency expert, and for her Curriculum Vitae and Report to be admitted as exhibits.  See Tr. at 24:22-24 (Rivas).  Dr. Cave then testified about her examination of C. Lewis and the Cave Report.  See Tr. at 25:14-41:25 (Rivas, Cave, Spiers).

The Court asked Dr. Cave how she reconciled her finding that "'[h]e knew what a plea bargain [was]' 'as well as what rights he would give up to get a plea bargain,'" with her finding that "'[h]e is not capable of comprehending at abstract concept like civil rights or plea-bargaining.'"  Tr. at 64:16-23 (Court)(quoting Cave Report at 7, 8).  Dr. Cave clarified:

> [T]he question is[,] ["]so if you enter into a plea bargain what civil rights do you give up[?"] and he gave the common answer that [a] criminal defendant always give[s] [ --] ["]all my rights["] [ -- ] so he didn't testify what they were but he knew if he entered a plea bargain basically that's it[,] it's a done deal [,] it's over and he doesn't have any right to anything else fundamental but I did not ask him what [those] rights were.

Tr. at 65:5-13 (Cave).  Dr. Cave continued:

> I did not ask him about his right to appeal, his right to cross-examine witnesses, his right to a trial by jury, I didn't break it down into the specific rights because[,] like I said[,] many criminal defendants [ -- ] he knows if you do . . . you give up all your rights even though he cannot specify what they might be.

Tr. at 65: 13-19 (Cave).  Dr. Cave expressed concern that C. Lewis "just goes with the flow" and "would do whatever his attorney [tells] him, without fully comprehending it."  Tr. at 66:6-8 (Cave). The Court asked Dr. Cave whether, if she were rewriting her report, she would omit the words "or plea bargaining,"  Tr. at 66:11 (Court)(quoting Cave Report at 7), and she responded, "Yes, I would," Tr. at 66:12 (Cave).

Next, the United States called Perry to testify.  <u>See</u> Tr. at 68:23-69:3 (Spiers).  Perry described his encounter with C. Lewis on the Greyhound bus in Albuquerque, on April 19, 2021. <u>See</u> Tr. at 70:2-16 (Spiers, Perry); <u>id.</u> at 73:4-18 (Spiers, Perry); <u>id.</u> at 75:22-85:15 (Spiers, Perry). C. Lewis interrupted Perry to contradict Perry's testimony that he was wearing shorts and a t-shirt, <u>see</u> Tr. at 73:16-18 (Perry, C. Lewis), to say, "Did you tell him about the bathroom too before I got on . . . the bus[?]," Tr. at 74:6-7 (C. Lewis), and to accuse Perry of lying, <u>see</u> Tr. 89:21.  Perry testified that C. Lewis did not seem incompetent:

> Q:     Now as you were engaging with him and he was speaking with you and he was answering your questions did you detect in any way that there was something irregular about him in terms of his [ . . .] competen[cy] or his ability to understand what you were saying and appropriately respond?
>
> A:     No, nothing at all. . . . I asked him subsequently if a backpack that he had on his back was his[;] he stated it was.  I asked him if he'd give me consent to search it and he said ["]No.["]  I asked him if he would open it up and show me. He said it just had clothing in there[;] I asked if he would open it up . . . and show me the . . . contents inside . . . the clothing[;] he said yes he did that he opened it up just a small portion where you could barely see anything that was inside of the backpack and in my opinion in a nervous manner and not to reveal the content of his backpack.

Tr. at 78:5-79:4 (Spiers, Perry).  Perry stated that he approached C. Lewis a second time, when he "asked him about [allowing a] narcotics [canine] to sniff his bag for the odor of illegal narcotics . . . ." Tr. at 80:18-19 (Perry).  Perry could not remember C. Lewis' exact response, but "he . . . probably[,] I think[,] asked me a question about was the dog there and I told him no but I was going to call one." Tr. at 80:20-22 (Perry).  Perry testified to listening to C. Lewis' conversation with his sister: "He was telling her that I was trying to[,] wanting to[,] search his bag and the police were there, and that they were trying to take his bag I believe was his comment." Tr. at 81:10-13 (Perry).  Perry then

> asked him about his ID[;] [he] said he didn't have one[;] asked him his name and then . . . about an address in case . . . [Perry told C. Lewis that, if] the dog didn't alert . . . and we didn't get a search warrant we could ship the backpack[.]  [H]e provided an address in Chicago with a zip code to me and I wrote it down on a card.

Tr. at 81:18-25 (Perry).  Perry testified that "I asked him for his name and date of birth[;] he provided that to me . . . ." Tr. at 82:3-4 (Perry).  The United States then moved to enter into evidence an audio recording of Perry's encounter with C. Lewis.  See Tr. at 86:5-7 (Spiers).

> Finally, Ms. Rivas argued on C. Lewis' behalf that
>
> Mr. Lewis is not competent to move forward with trial.  As an example, your Honor, I can tell you that every single day, every single day Mr. Lewis calls me and asks me the same question. . . .  Sometimes I take his calls twice a day and in that situation, it's still the same conversation.  I met with Mr. Lewis many times over the phone, by video, and in person, and we cannot, we cannot get any resolution as to just for him to understand what the United States sentencing guidelines are.

Tr. at 96:21-97:6 (Rivas).  She continued, "[H]e really only understands that he's looking at a lot of time. . . . He doesn't understand really what that time really is." Tr. at 97:11-14 (Rivas).  She told the Court that there are "legal issues that I'd like to move forward [with]. . .  I cannot move forward with . . .  those legal issues with Mr. Lewis' current lack of understanding, and my inability

to seek assistance." Tr. at 97:16-19 (Rivas). Ms. Rivas stated that, "[e]ven i[n] our break out room, . . . I couldn't get him focused on the questions," Tr. at 97:20-23 (Rivas), and "[w]e've been having conversations now for about nine, ten, for about six months, and almost every day we have the same conversation, and can't get really past that," Tr. at 97:25-98:3 (Rivas). Ms. Rivas argued that the recording of C. Lewis' encounter with Perry confirms C. Lewis' incompetency, because it shows that Agent Perry's questions confused C. Lewis. See Tr. at 98:8-17 (Rivas). Ms. Rivas argued that Lewis is intellectually disabled, and lacks an ability to "follow the court proceedings and really understand." Tr. at 99:5-9 (Rivas). She stated that C. Lewis did not understand what the proceedings today involved. See Tr. at 99:18-21 (Rivas). Ms. Rivas argued:

> Even in this court hearing we had a difficult time convincing him to really let the court hearing move forward. Now should this happen at trial before a jury that could be very detrimental. Similarly[,] if he remembers the facts that are beneficial and we believe we could convince a jury of his innocence, perhaps we would, I would be having a very difficult time trying to explain to him what's going to happen and what types of questions might be asked. So all of those things make it very difficult, Your Honor, to move forward with the investigation, with negotiations with filing motions, with any of these things that are required for me to properly and the effectively represent him. And so we ask the Court to find him not competent.

Tr. at 100:13-101:2 (Rivas).

The Court confirmed with the parties that the burden of proof in this case is with the Defendant. See Tr. at 101:18-22 (Court, Spiers). Next, Mr. Paul Spiers made closing arguments on the United States' behalf, see Tr. at 101:25-106:13 (Spiers), and Ms. Rivas made final arguments on C. Lewis' behalf, see Tr. at 106:19-109:11 (Rivas). The Court asked Ms. Rivas what makes her think "Mr. Lewis is an incompetent [client] rather than just a difficult one . . . ," Tr. at 108:17-19 (Court), and she replied that their attorney-client relationship is cordial, but that they

are not able to make progress because C. Lewis asks the same questions every day and they are not able to move forward with the case, see Tr. at 109:4-17 (Rivas).

## LAW REGARDING A DEFENDANT'S COMPETENCY FOR TRIAL

"[T]he criminal trial of an incompetent defendant violates due process." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996)(quoting Medina v. California, 505 U.S. 437, 453 (1992)(plurality)).   See Redden v. Calbone, 223 F. App'x 825, 830 (10th Cir. 2007)(unpublished)[9]("It is well-settled that the criminal trial of an incompetent defendant violates due process.").  "This 'prohibition is fundamental to an adversary system of justice.'" McGregor v. Gibson, 248 F.3d 946, 951 (10th Cir. 2001)(quoting Drope v. Missouri, 420 U.S. 162, 172 (1975)).  The Supreme Court of the United States of America has observed that "[t]he Federal Government and all 50 States have adopted procedures that address the issue of a defendant's competence to stand trial." Medina v. California, 505 U.S. at 447 (plurality)(citing 18 U.S.C. § 4241).

---

[9]Redden v. Calbone is an unpublished opinion, but the Court can rely on an unpublished United States Court of Appeals for the Tenth Circuit opinion to the extent its reasoned analysis is persuasive in the case before it.   See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that Redden v. Calbone, 223 F. App'x 825 (10th Cir. 2007), and United States v. Sanchez-Gonzales, 109 F. App'x 287 (10th Cir. 2004), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Under 18 U.S.C. § 4241, a defendant or the United States may file a motion for a competency hearing at any time after the beginning of prosecutorial proceedings, but before sentencing. See 18 U.S.C. § 4241(a). Once such a motion has been filed, the court shall grant the motion if there is "reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). To assist the court at the hearing, the court may order that a psychiatric or psychological evaluation of the defendant be conducted and that a report be filed with the court before the hearing. See 18 U.S.C. § 4241(b).

According to the United States Court of Appeals for the Tenth Circuit, the test for a defendant's competence to stand trial is "'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him.'" McGregor v. Gibson, 248 F.3d at 952 (quoting Dusky v. United States, 362 U.S. 402, 402 (1960)(per curiam)). See Ryan v. Gonzales, 568 U.S. 57, 66 (2013). "In a competency hearing, the 'emphasis is on [the defendant's] capacity to consult with counsel and to comprehend the proceedings.'" Medina v. California, 505 U.S. at 448 (plurality)(quoting Pate v. Robinson, 383 U.S. 375, 388 (1966)(Harlan, J., dissenting)). If the court finds the defendant incompetent to stand trial, "the court must order the defendant hospitalized for a reasonable period of time . . . for the purpose of determining whether there is a 'substantial probability' that the defendant will become competent in the foreseeable future." United States v. Deters, 143 F.3d 577, 580 (10th Cir. 1998)(quoting 28 U.S.C. § 4241(d)).

Competency claims may be based on violations of both procedural and substantive due process. A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent.

Allen v. Mullin, 368 F.3d 1220, 1239 (10th Cir. 2004)(quoting McGregor v. Gibson, 248 F.3d 946, 952 (10th Cir. 2001)). "The standards of proof for procedural and substantive competency claims differ. To make out a procedural competency claim, a defendant 'must raise a bona fide doubt regarding his competency to stand trial . . . ,'" requiring "a demonstration that 'a reasonable judge should have doubted' the defendant's competency." Allen v. Mullin, 368 F.3d at 1239 (quoting McGregor v. Gibson, 248 F.3d at 952, 954). While a procedural competency claim "does not require proof of actual incompetency," a "substantive competency claim . . . requires the higher standard of proof of incompetency by a preponderance of the evidence." Allen v. Mullin, 368 F.3d at 1239 (citing Cooper v. Oklahoma, 517 U.S. 348, 368-69 (1996); Walker v. AG, 167 F.3d 1339, 1344 (10th Cir. 1999)).

"[T]he Government may presume the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." United States v. Sanchez-Gonzales, 109 F. App'x 287, 290 (10th Cir. 2004)(unpublished)(citing Cooper v. Oklahoma, 517 U.S. at 355; 18 U.S.C. § 4241(d)). "[D]ue process considerations require suspension of the criminal trial until such time, if any, that the defendant regains the capacity to participate in his defense and understand the proceedings against him." Medina v. California, 505 U.S. at 448 (citing Dusky v. United States, 362 U.S. 402 (1960)). When providing that standard for determining competency, the Tenth Circuit has stated further that "[t]he standard of competence to enter a guilty plea is identical." Allen v. Mullin, 368 F.3d at 1238-39 (citing

- 20 -

Godinez v. Moran, 509 U.S. 389, 399 (1993)).

Because a finding of incompetence is a factual finding by the district court, the Tenth Circuit will review the finding under a clearly erroneous standard.  See United States v. Branham, 97 F.3d 835, 855 (6th Cir. 1996)("Because a district court's determination of competency is a factual finding we apply a clearly erroneous standard of review."); United States v. Raymer, 941 F.2d 1031, 1039 (10th Cir. 1991)("[W]e review a district court's factual findings under the clearly erroneous standard; our review of the legal principles which guide the district court is *de novo*."). See also United States v. Alainz, No. CR 13-1551 JB, 2014 WL 3421061, at *5 (D.N.M. June 24, 2014)(Browning, J.)(allowing the defendant to stand trial where counsel for both parties stipulated to competence); United States v. Mooney, No. CR 08-1545, 2014 WL 711551, at *4 (D.N.M. Feb. 7, 2014)(Browning, J.)(finding that the defendant diagnosed with major depression, alcohol dependence, and dementia because of head trauma competent, despite expert doctors warning that the depression -- if somehow left unmanaged -- might render the defendant incompetent); United States v. Enriquez Frias, No. CR 05-484 JB, 2006 WL 1228938, at *3 (D.N.M. Feb. 28, 2006)(Browning, J.)(ordering "Frias to be sent to a facility that the BOP designates for a second psychiatric evaluation to assist in a determination of competency"); United States v. Weathers, 374 F. Supp. 2d 957, 960 (D.N.M. 2004)(Browning, J.)(ordering a competency hearing).

In United States v. Williamson, No. CR 11-2784 JB, 2013 U.S. Dist. LEXIS 55069 at *76 (D.N.M. March 20, 2013)(Browning, J.), the Court concluded that the district court which presided over the defendant's competency hearing was unlikely to be reversed as clearly erroneous by the Tenth Circuit where

(i) [the defendant] was able to orient to person, place, and time; (ii) [the defendant]

was appropriately groomed and dressed; (iii) [the defendant] was alert, focused, and attentive; (iv) [the defendant] understood and responded readily and understandably, to [the psychologist's] questions; (v) the information [the defendant] gave in his answers was coherent and organized; (vi) although there was some tangential speech, there were no loose associations; . . . (viii) [the defendant's] memory appeared to be intact; (ix) [the psychologist] did not notice any cognitive defects; (x) [the defendant] showed an adequate range of affective expression; (xi) [the defendant] exhibited appropriate social awareness, social relatedness, and good social skills; and (xii) [the defendant] cooperated with [the psychologist] during the interview.

2013 U.S. Dist. LEXIS 55069 at *74 (quotation marks and citations to the record omitted). Additionally, the defendant appeared to the Court to be "lucid and reasonable and . . . was able to answer the Court's questions coherently" at his sentencing hearing.  United States v. Williamson, 2013 U.S. Dist. LEXIS 55069 at *76.  While "[d]efense counsel is often in the best position to evaluate a client's competence," Allen v. Mullin, 368 F.3d 1220, 1239 (10th Cir. 2004)(citing Bryson v. Ward, 187 F.3d 1193, 1201 (10th Cir. 1999)), "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency,"  Bryson v. Ward, 187 F.3d at 1201-02.  Nevertheless, the perspective of defendant's counsel is a factor the court should consider in evaluating a defendant's competence:

> Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, see United States ex rel. Rizzi v. Follette, 367 F.2d 559, 561 (2d Cir. 1966), an expressed doubt in that regard by one with 'the closest contact with the defendant,' Pate v. Robinson, 383 U.S. 375, 391 (1966)(Harlan, J., dissenting), is unquestionably a factor which should be considered.

Drope v. Missouri, 420 U.S. 162, 177 n.13 (1975).

There is no consistent correlation between a clinical diagnosis of intellectual disability[10]

---

[10]In Rosa's Law, Pub. L. No. 111-256 (2010), Congress amended various federal statutes so that "intellectual disability" is used instead of the term "mental retardation."  Pub. L. No. 111-

and a legal finding of incompetency to stand trial. As the United States Court of Appeals for the

Seventh Circuit notes, "a defendant's competency to stand trial is a legal inquiry, not a medical

inquiry, and 'the judge is the expert on what mental capabilities the litigant needs in order to be

able to assist in the conduct of the litigation.'" McManus v. Neal, 779 F.3d 634, 658 (7th Cir.

2015)(quoting Holmes v. Buss, 506 F.3d 576, 581 (7th Cir. 2007)). While a diagnosis of

intellectual disability makes the death penalty an unconstitutional punishment under Atkins v.

Virginia, 536 U.S. 304 (2002), a finding of intellectual disability is not dispositive for the purpose

of competency to stand trial. [11]

---

256 (2010). Along with other federal agencies, the Social Security Administration followed Congress' lead in 2013, see Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46, 499 (Aug. 1, 2013), as did the Department of Education, in 2017, see Rosa's Law, 82 Fed. Reg. 31, 910 (Aug. 10, 2017).

> The term "intellectual disability" is gradually replacing the term "mental retardation" nationwide. Advocates for individuals with intellectual disability have rightfully asserted that the term "mental retardation" has negative connotations, has become offensive to many people, and often results in misunderstandings about the nature of the disorder and those who have it.

> In October 2010, Congress passed Rosa's Law, which changed references to "mental retardation" in specified Federal laws to "intellectual disability," and references to "a mentally retarded individual" to "an individual with an intellectual disability." Rosa's Law also required the Federal agencies that administer the affected laws to make conforming amendments to their regulations.

Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46,499, 46,499 (Aug. 1, 2013).

[11] The American Psychiatric Association ("APA") defines "intellectual disability" as "problems with general mental abilities that affect functioning" in the areas of "intellectual functioning (such as learning, problem solving, judgment)" and "adaptive functioning (activities of daily life such as communication and independent living)." APA, What is Intellectual Disability?, available at https://www.psychiatry.org/patients-families/intellectual-disability/what-is-intellectual-disability (last visited Nov. 18, 2021). The American Association on Intellectual

## ANALYSIS

In a determination of competency, "the Government may presume the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." United States v. Sanchez-Gonzales, 109 F. App'x 287, 290 (10th Cir. 2004)(unpublished)(citing Cooper v. Oklahoma, 517 U.S. at 355; 18 U.S.C. § 4241(d)). The Court

_____

and Developmental Disabilities ("AAIDD")(formerly the American Association on Mental Retardation) similarly defines intellectual disability as "a disability characterized by significant limitations in both intellectual functioning and in adaptive behavior . . ." which "originates before the age of 22." AAIDD, Definition of Intellectual Disability, available at https://www.aaidd.org/intellectual-disability/definition. According to the APA and the AAIDD, the early onset of a disability is an additional criterion for a finding of intellectual disability. See APA, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013)("DSM-5"); AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support 27 (11th ed. 2010)); Hill v. Shoop, No. 99-4317/14-3718, 2021 U.S. App. LEXIS 24954, at *92 (6th Cir. Aug. 20, 2021)("[T]wo diagnostic manuals of the psychiatric profession require three separate findings before a diagnosis of intellectual disability is appropriate[:] . . . (1) 'significantly subaverage intellectual functioning'; -- typically indicated by an IQ level at or below 70; (2) 'significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety'; and (3) manifestation or onset before the age of 18.")(quoting Atkins v. Virginia, 536 U.S. 304, 308 n.3 (2002)).

While IQ alone is not dispositive in a diagnosis of intellectual disability, "a full-scale IQ score of around 70 to 75 indicates a significant limitation in intellectual functioning." APA, What is Intellectual Disability?, available at https://www.psychiatry.org/patients-families/intellectual-disability/what-is-intellectual-disability. The APA previously gave great weight to an individual's IQ in classifying the severity of an individual's intellectual disability: individuals with an IQ between approximately 50 and 69 were classified as having mild intellectual disability, those between approximately 36 and 49 as moderate, those between approximately 20 and 35 as severe, and those under 20 as profound. See Nat'l Acad. of Sci., Eng'g, Med. et al., Mental Disorders and Disabilities Among Low-Income Children Table 9-1 (Thomas F. Boat & Joel T. Wu, eds. 2015), available at https://www.ncbi.nlm.nih.gov/books/NBK332877/; APA, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1994). Since DSM-5, the APA and AAIDD classify the severity of an intellectual disability on the basis of daily skills and the amount of support an individual needs, highlighting the importance of an individual's adaptive functioning in making that determination. See Nat'l Acad. of Sci., Eng'g, Med. et al., Mental Disorders and Disabilities Among Low-Income Children Table 9-1.

concludes that C. Lewis has not met his burden of showing, by a preponderance of the evidence, that he is unable to properly assist his counsel in his own defense.  In Dusky v. United States, 362 U.S. 402, (1960), the Supreme Court stated that:

> It is not enough for the district judge to find that "the defendant [is] oriented to time and place and [has] some recollection of events," but that the "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."

362 U.S. at 402 (no citation for quotation).  To prove incompetence to stand trial, the defendant must prove incompetency by a preponderance of the evidence.  See Allen v. Mullin, 368 F.3d at 1239 ("A substantive competency claim, on the other hand, requires the higher standard of proof of incompetency by a preponderance of the evidence."); United States v. Sanchez-Gonzales, 109 F. App'x at 290.  "In a competency hearing, the 'emphasis is on [the defendant's] capacity to consult with counsel and to comprehend the proceedings.'"  Medina v. California, 505 U.S. at 448 (plurality)(quoting Pate v. Robinson, 383 U.S. at 388 (1966)(Harlan, J., dissenting)).

Courts often consider clinical data which informs a diagnosis of intellectual disability[12] -- such as intelligence quotient ("IQ") and mental age -- as factors in determining competency. Generally, Deborah B. Dove, Competency to Stand Trial of Criminal Defendant Diagnosed as "Mentally Retarded" -- Modern Cases, 23 A.L.R. 4th 493, 1a (collecting cases since Pate v. Robinson, 383 U.S. 375 (1966), where "courts have discussed or decided whether, or under what circumstances, a criminal defendant who has been diagnosed as mentally retarded, or as having a subnormal mental age or intelligence quotient, is competent to stand trial . . . .").  See United States

---

[12]See n.11, supra, on the definition of intellectual disability.

v. Pervis, 937 F.3d 546, 558 n.16 (5th Cir. 2019)("We certainly do not rule out IQ testing as significant.   Indeed, '[i]t is of considerable significance.'   We simply acknowledge its limitations.")(quoting Hall v. Florida, 572 U.S. 701, 723 (2014)).

Many courts have found defendants with a mild intellectual disability -- previously classified as those with an IQ approximately between 51 and 69 -- to be competent to stand trial. See, e.g., Deborah B. Dove, Competency to Stand Trial of Criminal Defendant Diagnosed as "Mentally Retarded" -- Modern Cases, 23 A.L.R. 4th 493, 4a.   See also United States v. Oliver, 626 F.2d 254, 260 (2d. Cir. 1980)(concluding that the trial court did not abuse its discretion in finding a defendant with an IQ of 68 competent to stand trial); White v. Estelle, 669 F.2d 973 (5th Cir. 1982)(upholding the competence of a schizophrenic defendant with an IQ of between 69 and 75); United States v. Wenzel, 497 F. Supp. 489 (D. Nev. 1980)(Reed, J.)(concluding that a defendant with an IQ of 55 and 60 was competent to stand trial); United States v. Pervis, 937 F.3d 546 (5th Cir.)(concluding that the district court's determination that a defendant with a low IQ was competent to stand trial was not clearly arbitrary).   Where courts have found a defendant with mild intellectual disability incompetent to stand trial, those courts generally mention or discuss an emotional or mental disorder or physical disability in addition to the defendant's intellectual disability.   See Dove, 23 A.L.R. 4th 493, 2a.   See, e.g. People v. Samuel, 29 Cal. 3d 489, 500, 506, 629 P.2d 485, 490, 493 (Cal. 1981)(reversing a judgment of conviction and setting aside a jury verdict that the defendant was competent to stand trial where the defendant had an IQ of 58 and also chronic schizophrenia); State v. Augustine, 252 La. 983, 994, 215 So. 2d 634, 637-638 (La. 1968)(holding that a defendant was not competent to stand trial where he had an IQ of 57, brain damage, and psychotic episodes and auditory hallucinations).   Unlike a mental illness such as

schizophrenia, bipolar disorder, or major depressive disorder, intellectual disability itself "is a lifelong condition that is incurable," and so "courts' use of competency restoration programs for persons with intellectual disabilities are inappropriate since the likelihood of restoration to competency is low."  Haleigh Reisman, Note: Competency of the Mentally Ill and Intellectually Disabled in the Courts, 11 J. Health & Biomed. L. 199 (2015), 229-230.

Although the Court understands that C. Lewis is suffering from a mild intellectual disability, the Court nonetheless finds C. Lewis competent to stand trial, because he is able to consult with his lawyer with "'a reasonable degree of rational understanding'" and has "'a rational as well as factual understanding'" of the charges he is facing.  Dusky v. United States, 362 U.S. at 402 (no citation for quotation).  The Court concludes that, although C. Lewis has an intellectual disability: (i) C. Lewis does not demonstrate that he is incompetent to stand trial; and (ii) commitment to the custody of the Attorney General is not appropriate and will only serve to further delay C. Lewis' trial, because C. Lewis argues that he does not have a mental disorder, the treatment of which would render him competent.

## I.    ALTHOUGH C. LEWIS LIKELY HAS A MILD INTELLECTUAL DISABILITY, HE DOES NOT DEMONSTRATE THAT HE IS UNABLE TO ASSIST COUNSEL IN HIS DEFENSE.

The severity of an individual's intellectual disability is best determined by a full consideration of his or her adaptive functioning, as well as his or her intellectual functioning, and the age of the disability's onset.  See DSM-5 at 33; AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support at 27.  Adaptive functioning describes an individual's ability to do the "activities of daily life such as communication and independent living."  APA, What is Intellectual Disability?,    available    at    https://www.psychiatry.org/patients-

families/intellectual-disability/what-is-intellectual-disability.   The evaluation that a court must conduct to determine if a defendant is competent to stand trial mirrors, in a sense, APA and AAIDD's renewed emphasis on adaptive functioning in evaluating intellectual disability.   A court cannot work from bright-line rules or rely solely on certain clinical indicia, but must make a case-by-case determination of each defendant's competency to stand trial.   This determination is based on a functional and legal -- not a solely medical -- inquiry into whether the defendant is capable to stand trial.   See McManus v. Neal, 779 F.3d at 658.   Nevertheless, a court also must consider clinical evidence such as psychiatric reports, clinic diagnoses, and a defendant's IQ and mental age in making such a determination.

Here, while C. Lewis has a mild intellectual disability, the Court concludes that C. Lewis is nonetheless competent to stand trial.   C. Lewis' intellectual disability stems from a gunshot wound to his head at age four, which indicates that his intellectual disability had an early onset. See Cave Report at 2; Tr. at 11:3-14 (S. Lewis, Rivas).   C. Lewis had trouble reading while in school, see Tr. at 12:10-12 (Rivas, S. Lewis), did not attain a high school diploma or GED, see Bail Report at 2, and was enrolled in special educational programs while in school, see Cave Report at 2.   Psychologist Paul Linden assessed C. Lewis at age eighteen as having an IQ of 61, see Cave Report at 3, and Dr. Cave assessed C. Lewis as having an IQ below 70, see Tr. at 32:19-33:16 (Rivas, Cave); Cave Report at 7.   The Peabody Picture Vocabulary Test4 -- "a wide-range instrument used for measuring the receptive (auditory) vocabulary" -- reveals that C. Lewis has a cognitive age of five years, six months.   Cave Report at 5-6.

Other clinical tests, however, cast C. Lewis' cognitive abilities in a stronger light: C. Lewis tested only just below average on the Rey 15 Item Test, see Cave Report at 4, and scored at "less

than the 25th percentile" in the Rey-Osterrieth Complex Figure test, which "examines the client's ability to recall information (memory) and copy it freehand (cognition)," Cave Report at 5.  In the CAST-MR test, C. Lewis scored fifty-six percent for his understanding of basic legal concepts, forty-six percent for "skills to assist defense," one hundred percent for understanding "case events," and had an overall score of sixty-two percent, which is just below the passing score of sixty-five percent.  Cave Report at 6.  <u>See</u> Tr. at 36:3-37:4 (Cave).  C. Lewis' factual understanding of court proceedings reveals a basic and mostly accurate -- if rudimentary -- understanding of how the criminal justice system works.  For example, C. Lewis knows that he is charged with "possession," which is a "felony," and is facing a sentence with "lotta time."  Cave Report at 6. C. Lewis understands that not guilty means "I didn't do the charge," whereas guilty means "you did it."  Cave Report at 6.  He understands that his defense attorney is "somebody [who] runs with you -- hears your side of the story" and is "somebody in your corner."  Cave Report at 6-7.  He understands that his role as a defendant is "not talking" and that, in court, he is supposed to be "quiet," but knows that he can speak "if judge asks you."  Cave Report at 7.  He describes witnesses as "somebody told on you" and the prosecutor as someone trying to "take you away," and characterizes evidence as "they got something on you."  Cave Report at 7.  These articulations are not far off the mark.  While C. Lewis has some misconceptions about the exact role of the judge, jury, and the United States' attorney -- C. Lewis believes the United States' attorney is "with the judge," the judge is there to "give you time," Cave Report at 6, and the jury's function is to "I don't know -- work with you," Cave Report at 7 -- these misconceptions do not necessarily indicate incompetence.  Many defendants do not have a precise understanding of the roles that the judge,

jury, defense, and prosecution play at the beginning of their representation, but their counsel advise and educate the defendants as their cases progress.

While S. Lewis testified to C. Lewis' problems with memory and understanding what is said to him -- he has problems remembering things that have been said to him an hour and a half later, see Tr. at 11:19-22 (Rivas, S. Lewis), and often "ask[s] the same thing over and over like he don't understand," Tr. at 11:17-18 (S. Lewis) -- he does not have trouble "recalling his actual experience," Tr. at 46:5-6 (Cave). C. Lewis remembered enough about the day he encountered Perry to interrupt and correct Perry's testimony about what he was wearing, see Tr. at 73:16-18 (Perry, Lewis), and to ask him: "Did you tell him about the bathroom too[,] before I got on . . . the bus[?]," see Tr. at 74:6-7 (Lewis). He also interrupted Perry's testimony to accuse him of lying. See Tr. at 89:21. Although Ms. Rivas argued that C. Lewis did not understand what the competency hearing entails, these interruptions demonstrate that he was able to follow and track the proceedings enough to engage with them, and that he will be able to assist counsel at trial with his factual understanding of events. See Tr. at 73:16-18 (Perry, Lewis)

In terms of C. Lewis' ability to perform daily tasks for himself and live independently, the evidence is mixed: C. Lewis has never been employed, and the SSA has found Lewis "unemployable," Cave Report at 2-3, or "100%" disabled, Tr. at 12:9 (S. Lewis). See id. at 12:6-8 (Rivas, S. Lewis). S. Lewis is the payee for Lewis' SSI payments, see Cave Report at 3, which suggests that it is hard for C. Lewis to manage his own finances. Since January 1, 2019, C. Lewis has lived with his sister S. Lewis, a brother, and several nieces and nephews. See Bail Report at 2. On the other hand, C. Lewis was able to get a bus by himself from Arizona to Illinois, see Response at 2-3; Cave Report at 2, and did not state that he needed or was given any support to

navigate this journey.  Not only was C. Lewis able to take the bus and travel across state lines by himself, he also was able to withhold and then give consent for Perry to search his bag, see Tr. at 80:18-22 (Perry), and describe to his sister over the telephone that Perry was "trying to[,] wanting to[,] search his bag and the police were there, and that they were trying to take his bag . . . ."  Tr. at 81:10-13 (Perry).  He also was able to report his sister's address to Perry while his sister gave it to him over the telephone.  See Tr. at 16:13-24 (Spiers, S. Lewis).

Finally, the Court considers the perspective of C. Lewis' counsel, Ms. Rivas, on C. Lewis' competency.   While "[d]efense counsel is often in the best position to evaluate a client's competence," Allen v. Mullin, 368 F.3d 1220, 1239 (10th Cir. 2004)(citing Bryson v. Ward, 187 F.3d 1193, 1201 (10th Cir. 1999)), "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency,"  Bryson v. Ward, 187 F.3d at 1201-02.  Nevertheless, the perspective of defendant's counsel is a factor a court should consider in evaluating a defendant's competence:

> Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, see United States ex rel. Rizzi v. Follette, 367 F.2d 559, 561 (2d Cir. 1966), an expressed doubt in that regard by one with 'the closest contact with the defendant,' Pate v. Robinson, 383 U.S. 375, 391 (1966)(Harlan, J., dissenting), is unquestionably a factor which should be considered.

Drope v. Missouri, 420 U.S. 162, 177 n.13 (1975).  Ms. Rivas argued at the hearing that "Mr. Lewis is not competent to move forward with trial."  Tr. at 96:20-21 (Rivas).  She described how, "every single day[,] Mr. Lewis calls me and asks me the same question. . . .  Sometimes . . . twice a day and . . . it's still the same conversation."  Tr. at 96:21-23 (Rivas).  Ms. Rivas described how she "met with Mr. Lewis many times over the phone, by video, and in person, and we cannot, we

cannot get any resolution as to just for him to understand what the United States sentencing guidelines are." Tr. at 97:3-6 (Rivas). Ms. Rivas stated that "he really only understands that he's looking at a lot of time. . . . He doesn't understand really what that time really is." Tr. at 97:11-14 (Rivas). After Ms. Rivas entered a break out room to talk with C. Lewis during the hearing, she stated: "I couldn't get him focused on the questions." Tr. at 97:20-23 (Rivas).

While the Court understands that Ms. Rivas is having to work hard to make herself available to C. Lewis on a daily basis, and to communicate with him about his case in a manner that keeps him focused on aspects of the case for which she needs his engagement and consent, the Court is not convinced that C. Lewis is unable to assist her with his defense. Viewing all the evidence presented in the Cave Report, and the testimony at the hearing, the Court concludes that, although C. Lewis has a mild intellectual disability, he has a basic understanding of the criminal justice system and the charges against him and can remember events and his own experience such that he is able to assist his counsel at trial.

## II.   C. LEWIS DOES NOT ARGUE THAT HE HAS A TREATABLE MENTAL DISORDER, AND THEREFORE COMMITMENT TO THE ATTORNEY GENERAL FOR A DETERMINATION OR RESTORATION OF COMPETENCY IS INAPPROPRIATE.

When courts have found a defendant with mild intellectual disability incompetent to stand trial, those courts generally mention or discuss an emotional or mental disorder or physical disability in addition to the defendant's intellectual disability. See Dove, 23 A.L.R. 4th 493, 2a. See, e.g. People v. Samuel, 29 Cal. 3d at 500, 506, 629 P.2d at 490, 493 (reversing a judgment of conviction and setting aside a jury verdict that the defendant was competent to stand trial where the defendant had an IQ of 58 and also chronic schizophrenia); State v. Augustine, 252 La. at 994,

215 So. 2d at 637-638 (concluding that a defendant was not competent to stand trial where he had

an IQ of 57, brain damage, and psychotic episodes and auditory hallucinations). Here, C. Lewis

suffered from a traumatic brain injury which is the cause of his intellectual disability. Less clear

is what other mental disorders C. Lewis may have, if any. The Cave Report describes an evaluation

completed in July 2011, when C. Lewis was seventeen, stating that C. Lewis was diagnosed with

"Adjustment Disorder, Oppositional Defiant Disorder, Intermittent Explosive Disorder, Disruptive

Behavior Disorder NOS, Provisional Attention Deficit/Hyperactivity Disorder, Mood Disorder

NOS, Mild Mental Retardation with a Full-Scale IQ between 54 and 63, History of Traumatic

Brain Injury, Fracture to his Phalanx, and Fetal Exposure to Substances." Cave Report at 3. In

the original Cave Report, Dr. Cave wrote that "[t]his particular list of diagnoses seem somewhat

ridiculous since most of his behavior[al] problems can be attributed to his brain dysfunction."

Cave Report at 3. She continues,

> The Oppositional Defiant Disorder, Intermittent Explosive Disorder, Disruptive
> Behavior NOS, and ADHD diagnoses can likely be attributed to defects in
> executive function and judgment. Persons with this type of brain dysfunction are
> often moody, which can be helped by medication. . . . For that psychiatrist to label
> him with all those diagnoses and prescribe no medication seems like a dereliction
> of his duty for patient care. Ten years later, it seems like many of these behaviors
> have fallen more into the norm, and that he has matured. His sister reports that he
> can get agitated but that most of the time he's fairly calm, and she does not have a
> problem having him in her house. There is no indication, information, or evidence
> that he is a danger to self or others.

Cave Report at 3-4. This text was omitted from the Amended Cave Report, and so it is unclear

whether C. Lewis argues that he does or does not continue to suffer from the disorders that Dr.

Nichols diagnosed in 2011. Because the Cave Report states that, "[t]en years later, it seems like

many of these behaviors have fallen more into the norm, and that he has matured," and C. Lewis

did not argue that he was still suffering from these mental disorders during the hearing, the Court determines that there is no evidence that C. Lewis still suffers from them.

The Cave Report also states that C. Lewis presently is suffering from post-traumatic stress disorder ("PTSD"), paranoia, and hypervigilance.  See Cave Report at 4.  Dr. Cave recommends that these "very serious psychological symptoms" indicate the presence of "serious depression" which "likely could be alleviated with appropriate psychotropic medication."  Cave Report at 4. Dr. Cave states that C. Lewis is "very depressed and socially isolating himself" in the detention center.  Cave Report at 8.  The Court understands that severe depression and PTSD are serious mental health conditions that require treatment, and sympathizes with C. Lewis' current mental health struggles in the detention center.  C. Lewis did not argue at the hearing, however, that these conditions make him incompetent to stand trial, and the Cave Report does not provide enough information about how they affect C. Lewis' daily functioning for the Court to determine that they render him incompetent, even when viewed in combination with C. Lewis' mild intellectual disability.  Even if Dr. Cave had endorsed or adopted Dr. Nichols' 2011 diagnoses, those mental disorders do not compare to the kinds of psychotic disorders that other courts have found indicate incompetence.

Finally, because C. Lewis does not argue that he has a mental disorder the treatment of which would render him competent, commitment to the custody of the Attorney General is not appropriate and will serve only to further delay C. Lewis' trial.  The Court concludes that C. Lewis is competent to understand the nature of the proceedings and charges against him, and that he can assist his attorney in his defense.  The Court finds C. Lewis legally competent to proceed to trial.

**IT IS ORDERED** that: (i) the Defendant's Sealed Motion to Determine Competence to Stand Trial, filed August 13, 2021 (Doc. 24), is denied; and (ii) Defendant Carmichael Lewis is competent to stand trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
  Acting United States Attorney
Paul H. Spiers
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Margaret Katze
  Federal Public Defender
Irma Rivas
  Assistant Federal Public Defender
Office of the Federal Public Defender
Albuquerque, New Mexico

     *Attorneys for Defendant*